The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Robert J. Stegman presiding. Thank you, Mr. Bailiff. This is our case number 4-23-623, which is FPM, LLC versus Ollmann Associates Architects, PC, and others. And for the appellant, will you state your name, counsel, please? Yes, Your Honor. Trent Cornell. And we have two lawyers arguing for the appellees. You first, Mr. Stevens. State your name for the record. Matthew Stevens for appellees, Sandroli Construction. And then, Mr. Post, please state your name for the record here. Jeffrey Post for Quincy Fans, DBA Aerovent. Okay, my understanding is that Mr. Cornell, as the appellant, will begin the arguments. And then Mr. Stevens will make the first argument on behalf of his client, Sandroli Construction, for 15 minutes. And the court has allotted another 15 minutes for Mr. Post for aerovent defendants. And then at that point, there will be rebuttal argument by Mr. Cornell. So with that understanding then, Mr. Cornell, on behalf of the appellant, you may proceed. Thank you, Your Honor. May it please the court. My name is Trent Cornell, and I'm here on behalf of Appellant FPM, LLC. FPM owns a large metal heat treating facility outside of Rockford. Metal heat treating requires the use of large furnaces that produce intense heat. The ventilation of that superheated air, in particular from these furnaces, is paramount to FPM's operations. The ventilation system failed in October of 2018, causing a catastrophic fire. It destroyed FPM's facility. It put its employees out of work and nearly put FPM out of business. As it began the process to rebuild, FPM selected a general contractor, Appellee Sandroli Construction. Sandroli was hired as the general contractor with overall responsibility for the project. It was paid for its design, its direct work by its employees, and 5% for all labor and materials used on the project for consideration of its supervisory responsibilities, as well as its warrant of the final product. Twin City Fans, or AeroVent, manufactures ventilation systems and fans for a particular purpose. Use in industrial high heat ventilation environments. After the installation and construction project, AeroVent fans were installed, and again fire broke out. Predictably, all of the parties pointed at one another as to who caused the fire. This much is known, they were caused by the ventilation system, but AeroVent will point to Sandroli, the others pointing to one another. Predictably, a complaint was filed. All defendants initially moved to dismiss the complaint. The initial trial court judge granted and denied the motion to dismiss in part. Importantly to today's discussion, Sandroli's motion to dismiss FPM's breach of contract claim against it was denied. After that denial, FPM filed an amended complaint that deleted the architect because of a mediation provision, then a second amended complaint adding back in the Rule 2615 of the Illinois Code of Civil Procedure. That is the first order that we are appealing today. The trial court under 2615 granted all motions to dismiss by all defendants on February 2nd, 2023. Shortly thereafter, FPM hired new counsel, and new counsel first filed a motion for reconsideration. Because notably, in the dismissal order, the trial court said FPM was not without recourse. It said, quote, FPM's recourse lies in the law of contract and breach of warranty for goods sold between merchants, the UCC. Accordingly, along with the motion for reconsideration, FPM also filed a motion for leave to file a third amended complaint, adding UCC claims against AeroVent, an additional breach of contract allegations against Sandroli. The trial court scheduled briefing on the motion for reconsideration, but deferred briefing and argument on the motion for leave until after it had ruled on the motion for reconsideration. In June of 2023, the trial court denied FPM's motion for reconsideration with prejudice. The trial court order again noted that FPM was not without recourse, stating, the court has noted twice that FPM's remedies, if any, are found in contract and under the Commercial Code. Nevertheless, in the same order, without briefing or argument, the court also denied FPM's motion for leave to file an amended complaint, a third amended complaint, with prejudice. Accordingly, as I stand here today, FPM has been left with no legal remedy against Sandroli or AeroVent. The trial court's rulings are reversible error, and we ask the court to reverse, one, the dismissal of the second amended complaint, and two, denial of the motion to file a third amended complaint. With respect to Sandroli, the first claim dismissed was a breach of contract. Now, as noted, the initial trial court judge denied Sandroli's breach of contract dismissal. The second trial court judge granted it in February. So, the third amended complaint would be the first opportunity that FPM would have been granted to amend after an initial dismissal of its breach of contract claim. That was denied with prejudice. But the dismissal of the breach of contract claim itself was improper. Whether a breach of contract has occurred is a question of fact under Illinois law. In the second amended complaint and in the third amended complaint, FPM laid out all of the elements of breach of contract, the breaches, particularly citing to the contract between FPM and Sandroli in Articles 3 and 10, alleging, among other things, that FPM had failed to supervise the work, that it failed to perform work in a workmanlike manner, and ultimately it failed to deliver a final renovation in accordance with the contract documents, as that term is defined in the contract between Sandroli and FPM. This is reversible error, particularly in the context of Rule 2615, and especially when no amendment was granted. The second dismissal with respect to Sandroli was of FPM's breach of contract, breach of warranty claims. Again, Sandroli was paid 5% for all labor and materials used on the project as consideration for, among other things, the warranty it provided for the final work product. The actual language of the warranty is as follows. Sandroli, quote, further warrants that the work will conform to the requirements of the contract documents and will be free from defects, except for those inherent in the quality of the work the contract documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective. What are you reading from? I am reading from the actual warranty, which is found at A-114. It's section, excuse me, Article 3.5.1 of the contract between Sandroli and FPM. Okay, thank you. Yes, Your Honor. Sandroli now acknowledges that FPM did allege that the equipment did not conform to the agreement's requirements. Sandroli argued to the lower court and argues to this court now that it had no idea that there were heat requirements in the contract. That is belied by the contract documents themselves. It's also, particularly in the context of a 2-6-15 motion, a question of fact. But in its brief to this court, Sandroli makes the statement that it wasn't aware and provides a citation, citations that would indicate perhaps citation to the contract, maybe even to the complaint. In fact, those are citations to transcripts of arguments made by Sandroli's own counsel, as well as the counsel for two other defendants. There is no fact. And at any rate, the fact attempted to be argued at that point is improper at this stage of the pleadings. FPM properly alleged a breach of dismissal deals with FPM, but also has implication to Arrowhead, which is the court misapplied the Mormon doctrine. The court's obviously familiar with Mormon. What the trial court misapplied specifically was the first exception to Mormon. That is, quote, with a plaintiff's sustained damage, i.e. personal injury or property damage resulting from a sudden or dangerous occurrence. The sudden and dangerous occurrence, or sometimes it's called the sudden and calamitous occurrence, is subject to many cases under Illinois law. The trial court cited to a case called Heckman versus Pacific Identity. In that case, an HVAC system was apparently not operating properly. It caused a wood floor to warp over time. The court obviously said that a warped floor is dangerous. The Heckman court, however, went in to describe what would be a sudden and dangerous occurrence. It cited to a brick wall. When the brick wall was constructed, how long the brick wall stood is irrelevant to the event of a brick falling off that wall and hitting somebody on the head. It is the event that determines the sudden and dangerous occurrence. We cite also to United Again, a defendant said that was neither sudden or dangerous because water had to collect. The court, however, said no. It was sudden and dangerous because the event, the measuring event, was the collapse of the roof, which was inherently sudden and dangerous. We cite also to the Seeger's grain case where a grain tank exploded. In that case, the defendant noted that the tank had been fixed three months prior. So, it said the plaintiff obviously knew there must have been some issue. This couldn't be sudden or dangerous. The appellate court said no. It was sudden and dangerous because the event, the measuring event, was the implosion. It was irrelevant if there had been repairs prior. Here, there was fire that broke out, which is, by its very nature, sudden and dangerous. The allegations all fall within the exception to the Mormon doctrine for sudden and dangerous. Shifting to AeroVent. AeroVent, the contract documents that govern Scandrolli's work and govern the entire renovation project, called for a ventilation system that operated between 400 and 2,000 degrees internally and, importantly, from 100 to 600 degrees at the exhaust fans of the roofline. AeroVent sells the exhaust fans. AeroVent provided technical specifications stating that, quote, based on this extensive testing, the model SV40 is capable of withstanding continuous operations at 600 degrees, extended operating periods at 800 degrees, and eight hours or more with an airstream temperature of 1,000 degrees. Counsel, let me stop you there. Is that what was represented in the catalog, what you just referred to, those temperatures? Yes, they were in the information that AeroVent provided in its technical specifications in the catalog, as well as in follow-up discussions where its agent represented. Explain to the court, if you would, why what is represented in the or agreement of the parties as to what the ventilators would sustain? I'm not sure I understand. The contract itself only called for the parameters. The AeroVent's technical specifications tied directly to what its particular fan capacities were. So, the contract documents incorporated the general specifications, but AeroVent was only describing what its product capabilities were tested to achieve. I'm not certain I'm answering your question. Well, I probably didn't phrase the question in a proper fashion. I guess what I'm asking is, what is the relevance to this court regarding the issues before us of what is represented in the catalog? Could you tie that together for me, clarify that? Yes, because what was represented in the catalog or in the technical specifications and followed up with other statements is the purportedly tested capacity of these fans. In reliance upon those technical statements of the fan's capacities, the fans were purchased and put into use. Counsel, I have a question about the court's ruling in this case regarding AeroVent. The court placed reliance upon the decision of the appellate court, the people of Peters versus Murphy Knight. Yes, Your Honor. We believe that reliance was misapplied. What I'd like you to explain is how the court misapplied its understanding of how misapplied that holding effect is. Yes. In Peters versus Murphy Knight, at issue was an HVAC system that was used actually in the Thompson Center in Chicago. The defendant had provided technical specifications as to what this system could do, its capacities, the pound pressures, things like that. The trial court in that case dismissed. And it said that the statements that were made by defendants were opinion, puffery, not actionable. On appeal, the Peters versus Murphy Knight appellate court reversed. It said that if a statement is one that is specific, a measurable claim, or can be reasonably interpreted as a puffery or opinion. So in this case, the statements made by AeroVent as to the tested or reportedly tested capacity of its fans were specific measurable claims that were capable of verification. And in fact, AeroVent affirmatively stated that it had alleged that it had verified and extensively tested to these specifications. Did you, in your petition for reconsideration, point out to the trial court that it misconstrued the holding in Peters? I'm sorry, your honor. I didn't hear that. In your motion for reconsideration, did you point out to the trial court that it misconstrued the appellate court's holding in circumstances of this case? Yes, your honor. What the court said? It said it didn't. So, I'm trying to understand, you know, I think we as common consumers understand puffery, you know, this is taste best or this is the best car or whatever, but it seems like the allegations you said in this case were not puffery and more specific. What was the argument at the trial level by AeroVent on why that didn't apply? AeroVent, I don't know, actually made this argument. It was picked up by the appellate, excuse me, by the trial court. And what AeroVent had said is these were just statements that were these were specific statements of fact that they were not to be relied upon. The allegations of the complaint state that but for these specific statements of fact, the AeroVent fans would never have been purchased in the first place. And your contention is that's a question of fact to be Thank you. The other another with respect to AeroVent, the AeroVent in its briefing to the court states that FPM did not allege that it actually had knowledge of the falsity of its statements. It states that in the second amended complaint, the allegation of the ultimate conclusion was upon information and belief. We cite case law that a statement of the defendant's knowledge even under heightened pleading standards is an allegation of ultimate fact and not There are no upon information and belief with respect to this allegation. The third issue with respect to AeroVent is there were root cause reports that AeroVent had prepared. AeroVent in these reports, which were attached to the second and third amended complaint, after initial failure of fans, had produced these reports stating that, well, they were attached for three things. One, the evidence of failure of the fans in the first instance. Two, they support the conclusion that AeroVent's statements may have been false. And three, AeroVent states that Scandrolli or its subcontractors improperly installed or wired the fans, an argument Scandrolli, excuse me, AeroVent again brings up before this court, which ties to the breach of contract. Also again, pointing out the finger pointing between AeroVent and the construction folks. We don't know who is right. We just know that in this instance, something happened in this case of fire and the devastation from the fire. Moving quickly, the third amended complaint. Again, the trial court repeatedly stated that FPM's recourse lie in the law of contract, and quoting the court, lie in the contract and breach of warranties for goods sold between merchants, the UCC. FPM, in its proposed third amended complaint, added three UCC claims against AeroVent. Breach of express warranty, breach of implied warranty of merchantability, and breach implied warranty for particular fitness for particular purpose. They added additional contractual allegations against Scandrolli for breach of contract, including roof membranes block the ventilation system. There was improper wiring of the ventilation system as AeroVent alleges. There was improper building of combustible wood housings that themselves were fire hazards. Part of Scandrolli's work, part of the breach of contract. Counsel, let me ask this question. Is your appeal of the trial court's dismissal of the second amended complaint connected to its rejection of your request for a third, to file a third amended complaint? I'm not studying this well. In other words, if this court were to agree with your argument about dismissing the second amended complaint and reversed and remanded the mat, what would that mean as far as your request concerning the wish to file the third amended complaint? It would allow claims that are asserted in the third amended complaint to be asserted. The new claims in the third amended complaint are UCC and additional contract allegations. Without the reversal of the dismissal of the second amended complaint, some of the allegations in the third amended complaint could not be asserted. The court dismissed the prejudice. Well, if this court were to agree with your argument about the second amended complaint, what would that mean regarding the issue of the trial courts not permitting you to file the third amended complaint? I think your honor, if there was a dismissal of the second amended complaint, we would still file for leave to file a third amended complaint to add additional UCC claims. We're new counsel coming in. We would like the first opportunity to add some additional claims, but I understand what your asking. But I think without the dismissal of the second, we couldn't have the third. So they do tie together. Thank you, counsel. At this time, then, Mr. Stevens, on behalf of Scandrolli, is that pronounced correctly? Scandrolli Construction? Yes, your honor, it is. You may make your argument, sir. May it please the court. My name is Matt Stevens. I'm here on behalf of Appellee Scandrolli Construction. The issues presented here, and I'd just like to bullet point them. There's three in addition to a jurisdictional issue. The first issue is breach of contract. We believe the trial court properly dismissed the second amended complaint for failing to state a cause of action for breach of contract. Despite the repeated attempts, the simple fact remains FPM wants to rewrite the contract between it and Scandrolli to find some kind of performance warranty and say that Scandrolli had a duty to make sure that these AeroVent fans performed as AeroVent said they would. But there is simply no support in the contract for any of those OEM, which is currently a defendant in the underlying case, is the designer architect engineer of record. And the second amended complaint clearly shows Scandrolli is the contractor, but it does not have design duties. Scandrolli was required to follow the specifications put forth by the architect. We simply had no choice. And those specs spelled out exactly what fans to buy, the manufacturer AeroVent, and the different model types required in different areas of the FPM plant. And that's exactly what happened. What about the argument that FPM makes that your client was at least partly responsible for procuring a ventilation system that could meet the needs of the plant? We strongly disagree with that, your honor. There is absolutely no contractual language that says Scandrolli has any role in recommending those fans. FPM cites to no such evidence in its second construction contract, says Scandrolli's obligation is to perform the work, which is a defined term there with a capital W. And I don't want to belabor the court by reading that entire paragraph, but simply put, the work is executing the plans put forth by the architect. There's no such requirement put out by some other company, nor is there anything that says Scandrolli is going to participate in recommendations with regard to that. What about this, counsel? Didn't the contract provide that quote, prior to the execution of this agreements, Scandrolli has provided design and constructability consultation on the project, which the contract referred to as prior work. They do quote that contractual provision, which is a standard contractual provision. However, the second... Wait a minute. I don't, you know, you keep on talking about this is standard or whatnot. That's a meaningless description to me, counsel. I'm sure you're much more experienced with these than I am. And what I'm looking for is whether it's standard or not or used or not, what does it mean in this particular case? Why isn't that language suggest that Scandrolli had a role? The short answer, your honor, and I respect that. I respect your point. I want to get back to that. The short answer is they never show or allege that Scandrolli actually performed that consultation. The reason, your honor, that I had suggested or pointed out several times, the standard contracts is that in these forms, there's a clear distinction between the duties of the designer, which is the architect that specifies the equipment. The architect didn't just specify we need exhaust fans. The architect specified specific AeroVent branded fans and specific AeroVent model numbers. And for its part of a standard contract, Scandrolli was there simply to construct the building rather than design the building. Well, wasn't there an allegation that Scandrolli approved the submittal of the ventilators from Cerrone and submitted those to the OEM who approved it? Yes, your honor, there absolutely is that allegation and we don't- Why isn't that enough to suggest that becomes a question of fact on Scandrolli's role as whether it was involved in the approval laws? Because as we argue, your honor, approving a submittal only means we look at the specifications from the architect which say there should be X number of AeroVent fans bearing these model numbers. That's all approving a submittal is. Well, wait a second. I don't understand how that's an approval. I mean, that would be, we understand that's what it's called for. In the English language, you say this contract calls for us to do so and so. It's a different use of the term to say, oh, and we approve of it. You seem to be merging these two concepts. Why does that figure? How does that follow? The approval is simply to say, here's the equipment we're required to install, the specific AeroVent fans. What Cerrone, our subcontractor, has given to us is a list of the specific AeroVent fans that they are proposing to procure and install. That's what we send back up to OEM for approval. That's how the chain works is that OEM says, here's the equipment to install. We pass that to our subcontractor. The subcontractor gives you a document that says, okay, verify this is the equipment. We pass it back up to OEM. OEM says, yes, that's correct. And then we say, Cerrone, yes, that's correct. Go ahead and purchase it. So you didn't approve the submittal of the ventilators? No, we did, but the approval is not that we verified how AeroVent products work. Well, when you say you approved it, does that mean that under different circumstances, you could have disapproved it and say, no, this isn't appropriate? The disapproval would be if Cerrone said, hey, instead of AeroVent fans, we found a cheaper model. It's Acme fans. So, hey, Scandrola, here's some Acme fans that we think are going to be better. Scandrola's job then is not to compare Acme to AeroVent. Scandrola's job is to say, look, here's your specs from the architect. They say AeroVent fans, Scandrola, or sorry, Cerrone, we need AeroVent fans. Go ahead. Your Honor, I think the one way to phrase the issue that you and I are discussing is FPM would like to characterize this as sort of a performance contract to say, hey, Scandrola, we told you when our exhaust fumes were, why didn't your products meet that? And the response is, you told OEM, the designer, what your exhaust temperatures were, and it was up to OEM in conjunction with FPM to decide what products met that. There's nothing in Scandrola's role as defined by the contract that has us give a performance on those products selected by others. We're a construction company. We don't verify the fan capabilities. We have no way to do that, and there's simply no role for us to do that under the contract. Your Honor, I'd like to turn to the Mormon issue now. The second issue on appeal, does the economic loss rule preclude claims in tort? The circuit court found that it does, and here we would urge the appellate court to make the same finding. The essential point here is that economic loss is the damages from breach of contract and diminished commercial expectation, which is exactly what we have here. I think the two most important facts are this. There was a report from AeroVet in December of 2019 detailing multiple issues with the exhaust fans. They noted repeated failures. They talked about various courses of it, and I don't need to get into a dispute between AeroVet and FPM about the operation of the fans, because the fans did numerous variable controls that FPM controlled. My point here is that there were documented failures, multiple failures, of the majority of the fans by December of 2019. FPM then files its suit January 4th of 2021, and then fire breaks out on January 7th of 2021. That's a year and a half after FPM alleges it first noticed issues with the fans. It's a year and two months after they had a written report noting that most of the fans were failing. There is nothing sudden about that deterioration. Now, I know FPM's response is, hey, so what? The fans were failing. We just kept doing our thing, and then we were suddenly confronted with this fire that we couldn't possibly have expected. Here's the critical issue they ignore. There's no allegations that the fans caught fire. This is very distinct from numerous other cases where a product fails and then damages other property. In this case, what FPM alleges is, we had a fire on January 7th of 2021. The next part of that complaint is, which must have been the result of the fans. But here's what they don't allege there. They don't tell us, was the fan over that particular area where the fire occurred operating, or was it one that they had already been notified and writing had failed, and they just continued to operate? FPM's entire conclusion there is simply, well, if there's a fire, it must have been you guys, contractors. That's simply not the case. While the fire may be sudden and dangerous, the alleged product failure was not, and there aren't sufficient allegations to link the alleged product failure with the fire. The third issue before the appellate court is whether the trial court abused its discretion in denying leave to file the third amended complaint. These first two issues, breach of contract and Moorman, these are de novo reviews. The standard of review is pretty clear. However, I would just like to remind this panel that the abuse of discretion standard is no reasonable person would have taken those actions. Council, I want to go back to your discussion about the sudden fire and what the court said. They seem to be arguing that there's a failure to link the fire to the ventilators, but didn't the court find that the fire was not a sudden and dangerous or calamitous event because the ventilators failed over a period of time? Yes, your honor, and I do think those two things are connected. I hear where you're going that how can they be surprised by the fire if the fans had been failing, and certainly that argument resonates with me, but I think it's a distinct argument to point out that just because there was a fire doesn't mean that the ventilation system caught it. After all, you also argue to the trial court that the cause of the event was the condition of the ventilators failing over time instead of the sudden fire. I think we would have or at least should have phrased that as hypothetically, if the cause of the fire was the failure of a fan, then that was a gradual deterioration. The reason I ask this is this doesn't seem to be an argument or a finding by the court based upon no connection between the ventilators and the fan. It seems to be an argument that it wasn't a sudden calamitous occurrence with the ventilators and the fire. Agree, your honor. I think they're distinct arguments. Should I clarify further? You have a few minutes left. I'll let you finish. Okay. I'd like to talk that in these few minutes for breach of implied warranty. I believe I've covered the other breach of contract issues. Implied warranty requires a seller to have both knowledge of a particular purpose and that FPM relied on the seller's judgment. Again, there's nothing here to show that Scandroli exercised any judgment whatsoever. Scandroli was simply following the contract documents that was required to follow. Your time is up, Mr. Stevens. Thank you. Mr. Post, you may argue on behalf of Beverly Irwin. Your honor, I apologize, but can I make one last point that got lost? I would just like to renew Scandroli's jurisdictional issue. This panel, I don't know if it was this specific panel, but the motions to dismiss by Cerrone and J.C. Cross were granted on the argument that the notice of appeal wasn't timely filed. We then filed a motion to supplement the record to show that the circuit court said, Scandroli, you don't have to file a written motion for 304A language. My request is that this court find Scandroli as similarly situated to Cerrone and J.C. Cross and dismiss the appeal against us for not being timely. Okay, counsel. Mr. Post, you may proceed. Your honor, I'm a fan of Sherlock Holmes and one of the famous stories, Silver Belay, Sherlock Holmes solves it by realizing the clue is the dog that didn't bark in the night. When you look at the complaints, all three of them in this case, it's really the dogs that didn't bark that are the key. What I mean by that is that there's just a failure to plead essential elements of the fraud claim in particular, your honor. First of all, let me start with the notion. You see this repeated assertion that J.C. Cross is an agent of Aerobent. There are no facts pled to support that. The first judge on the motion to dismiss noted the need to plead specific facts to establish agency. There's no pleading that ever establishes any facts that J.C. Cross is our agent. The importance of that- J.C. what? J.C. Cross. Cross? Cross. J.C. Cross. Okay. And the importance of that is that the only party that made any sort of oral representation regarding the fans is J.C. Cross, which is a distributor for multiple types of fans. And in order to tie that representation back to us, there would have to be some agency relationship. And there's no facts that are pled to support that. And so in reality, they have to rely slowly on the catalog issue. And I'll get to that, why that reliance is misplaced. J.C. What issue? Analog? J.C. Yeah. The product catalog. J.C. Catalog. Okay. I wasn't sure I heard. J.C. Yeah. There's a product catalog because there's no communications, oral communications that are alleged in the complaints between us and FPM or frankly, any of the other parties. Next, Your Honor, there's a general lack of facts to demonstrate intent in this case. In fact, they allege fraudulent intent on the basis of information and belief. And under the Green versus Rogers case, which is cited on page 16 of our brief, that's simply insufficient under Illinois law. So the practical matter, they don't show that we had any intent to mislead them. They just point to our catalog. Now, what's interesting is the way that they tried to prove intent is by attaching two of our investigation reports to their complaint. Again, that's their decision. And if you look on page eight of our brief, there's a diagram from one of those investigation reports. And basically, you'll see an L on that diagram. The vertical part of the L is red, and that's the air stream that has to handle temperatures to 1,000 degrees. And then there's a green line, which is where the belt tube runs, and that pulls air from the outside while the band's operating to cool the components. And those are the components that failed in the investigation report. All we did is explain what the exhibits meant. And they complain about that. But the irony of those complaints is that they were the ones that attached them and tried to argue that those investigation reports demonstrated fraudulent intent. But now, if you read their briefing, they run away and say the court shouldn't consider those investigation reports. And that's fine, Your Honor, if that's their position. It just, again, demonstrates in stark terms that there's no proof of fraudulent intent on air events, or... Counselor, I received the same question I asked Mr. Cornell about the Peters case. And first, I want you to comment on whether I am correct that the trial court in this case held that representations about a machine of known physical characteristics and its capabilities, based upon the application of certain mathematical formulas and laws of physics to those physical properties, were statements of opinion. Did the trial court hold that? I think what the trial court was a little bit more nuanced than that. What they said is when you look at the catalog, you need to look at it in total. You can't isolate particular sentences and say... The reason I raised this question is it seems to me that Peters holds exactly the opposite, doesn't it? It does on the first point, but Peters has a second holding that's very important in this case, Your Honor, and that's that you have to show actual reliance. And we're allowed to make that argument under the standard of appeal. If you look at the second portion of the case on page... Northeast 2nd, 466, it shows that you have to show that there's actual reliance. And there's no showing. If you look carefully at their pleadings, they sort of dance around this, but there's no pleading that anyone ever looked at and relied on the catalog. And under the Peters case, if you can't demonstrate that sort of reliance, you don't have a sufficient broad claim. Well, didn't the Peters court hold that the statements I just described were considered representations of existing fact as opposed to representations of opinion dependent upon future action or sales talk or puffery? It's true. Peters has two separate holdings in there, Your Honor. You're correct on the first one that technical representations can sometimes be actionable as statements of fact. What the in their entire context, and you can't just block them out. The second holding from the Peters case, Your Honor, is that you have to show actual reliance. You have to show that one of the parties reviewed the product catalog and relied upon it. And if you look carefully at the pleadings, they don't demonstrate that. In fact, if you look at page nine of our brief, which is exhibit five to one of the complaints, it shows that Scandrolli and Ceroni approved the fans, approved the fan drawing, signed off on them when the fans were rated for 70 degrees, not 600 degrees. So the only document that they can show what was communicated actually only had 70 degree rating on it. And that's at page nine in our brief. So, Your Honor, our panel, their fraud claim fails for two reasons. One, there's no showing of intent to deceive on my client's part. And two, there's no showing of reliance. They simply, despite being given multiple chances to plead those, they don't plead that. Now, so let me ask you this. You say there's no reliance on the catalog, but the catalog is attached to the complaint. What would be the purpose of attaching it if there's no reliance upon said catalog? Well, because they're trying to create the perception that there was a fraud claim based on representations on their catalog, but there's no showing of reliance on them. They have to show that there's, what they basically do is take representations that are out there in the ether and say, aha, here's some representations your client made in a catalog. But then they don't plead the important stuff that either Ceroni or Scandroli or FPM relied on those catalog statements and making the decision to purchase the fans. In fact, their signed off on only show them rated to 70 degrees. So they do attach it, your honor. I'm following what you're saying. And they had to have a specific allegation is the catalog said the ventilators would withstand 600 degrees or a thousand degrees under certain circumstances. And we relied upon what the catalog said, and they failed to say that latter part. Right. Right, your honor. You have to show that we got the catalog. We relied on the catalog. They don't do that. They sort of plead around it. They say, well, there's this catalog and some, we must have relied upon it, or we wouldn't have purchased the fans if we knew the catalog wasn't right. But there's no specific factual allegations that demonstrate someone received that catalog at some point prior to selecting the fans and relied on that catalog and making the decision. In fact, like I said, that'd be a back question, whether they relied upon it, that it would be proof. Yeah. Reliance is an element of their claim. And so they need to plead that if they successfully pled that, then it would become a fact issue at this stage. But they haven't pled any specific facts that demonstrate that reliance. And like I said, in fact, their own exhibits show the opposite. The drawings, the approval drawings of the fans that are signed off on are rated for 70 degrees. And those are on page nine of our brief. You can see the actual 70 degree rating that's signed off on, your honor. So did I address your question? Yeah, you answered it. Thank you. Thank you. So your honor, just to summarize again on the broad claim, there's no showing that they intended to see, you know, there's no showing of reliance and they've had multiple attempts to, to believe that. And that's why the court's question to, is important. What's the relevance of the catalog? That's one of the questions the court asked at IBM's counsel. There is no relevance because there are no specific pleadings of reliance. Your honor, next I would return to the Mormon doctrine. I don't have a lot to add. Counsel for FPM, or excuse me, counsel for Scandrolli made the points that I was going to make at this point. He made it, but I would just say one thing is the fact that there was a fire in and of itself doesn't mean that there is a sudden and flammatious event. If you look at the progressive case that's cited on the bottom of page 20 of our brief, that case holds that fire alone is not enough to bring a claim outside the Mormon doctrine. I admit to the court, this is a closer call. You do have the pleadings are undisputed that the fans failed over time. And at the end of that, you have this fire and there's no pleading to demonstrate that the fans actually caused the fire. But it presents, it presents a call for the court to draw that line. But as counsel for Scandrolli pointed out, this is failures over a year taking place. So there's nothing sudden and flammatious about that, your honor. Next, I would move on to the issue of whether it was proper to deny leave to a man. And I will say it's well within the discretion of the trial court to disallow a third or fourth bite of the apple, which is what we're dealing with here. In particular, because he had the same defects on the non-UCC claims that were present in the two previous versions of the complaint, and those aren't here. But there's also a significant issue with regard to the UCC claims that they attempt to plead. Now, they did point out and they include the language in the contract between Scandrolli and FPM, that warranty language. But they don't attach the warranty between FPM to the extent one exists or the warranty between Cerrone. Because Cerrone, even under their pleadings, there's no dispute that Cerrone was the buyer in this case. They don't attach that warranty. They don't attach the contract as required by Section 5-2-606. And this isn't the first time we ran into this issue. There was an issue on the first complaint where they failed to attach the contract also in a different context when they claimed to be a third-party beneficiary to a contract, Your Honor. And so, they should have included that warranty statement and they didn't. And it's not on the record, but I think the reasons would be abundantly clear that they did. The warranty statement, the warranty contract is between Aerovent and Cerrone. It's non-assignable and it disclaims any implied warranties. They should have included that contract and allowed the court to make the decision. The fact that they didn't is quite telling and they shouldn't be given leave to amend. So, we just have to go back and move to a dismiss again on this basis. They should have included that they were going to make a warranty claim, the warranty, a long time ago. There was nothing that precluded them from doing it. And so, we would be prejudiced by having to brief for a third time at this late juncture another motion to dismiss when they should have included it. And so, we think not only was the failure to allow the leave to amend not abuse of discretion, but it was more than warranted given the circumstances of the case. Thank you. Thank you, counsel. Mr. Cornell, this time you can have five minutes for rebuttal, sir. Mr. Cornell, I have a question before you begin. I would like for you to address the statements regarding the incidents over time of the failure of the fans and how that fits in with the notion that there should be an exception to the Mormon doctrine as a result of a sudden and sudden calamitous event. I guess one thing that's important as we noted that this project didn't all happen at once. It was over time. When the fires broke out, Scandroli was still working at the project. These are not the same one fan or two fans. There are 26 different fans that were ultimately put into use. So, certain fans had failed early based on what Scandroli said was a failure of the fans, what Aerobent said was improper wiring. Scandroli was still on site with its subcontractors making modifications. So, this issue of they went into use and then there was some long period of time, one, I don't think relevant to the sudden and dangerous, two, is factually not correct. When the fans were put into operation that were operational, they did cause fire. Despite the comments made earlier, there are repeated allegations in the second amended complaint and in the third amended complaint that's proposed that these fans caused the fire. Now, whether the improper wiring to the fans, whether the fans capacity was the direct cause, we don't know. We have Aerobent pointing to the subcontractor Scaroni by extension Scandroli. We have Scandroli pointing to Aerobent. We know the fire was caused by the fans. We don't know whether it was wiring, whether it was the fans, what it was. We know and there's indication that the fans did not operate in the parameters given the temperature specifications. Your Honor, I hope I answered your question. Thank you. Counselor, I have a couple of questions of my own. You heard the defense counsel raise the name of J.C. Propst as raising the question, was he an agent of Aerobent and what about that? Was he and what allegations support that? Your Honor, we alleged that J.C. Propst was an agent. In prior briefing, J.C. Propst, when involved in the case, admitted that it was an agent. In the court's ruling, the first dismissal order, which is appendix 242, the trial court noted that there were no outside of its status as Aerobent's agent. What it was relying upon J.C. Propst was it was an agent just doing what it was told to do. The issue of agency is a new one coming up now and it is in opposition to the position taken both by J.C. Propst and Aerobent in the lower court. Also, if I understand correctly, there's a claim that your client, FPM, relied upon the catalog information. You're making that claim and the question is, did you plead reliance on it in your complaint? Your Honor, at paragraph 188 of the second amended complaint, it reads, Aerobent made the or other contractors to approve and purchase the Aerobent fans for use at the plant. The next allegation, paragraph 189, FPM and its agents and other contractors relied on the misrepresentations of Aerobent in approving and purchasing the Aerobent fans for use at the plant. We specifically, repeatedly, alleged reliance upon the, what they're calling the catalog, the specifications in the catalog was the only reason that these fans were purchased in the first place because they fit the contractual requirements for what was needed, specifically 100 to 600 degree capacity to run. That was bolstered again by J.C. Kross prior to sale when just before sale, Cerrone, somebody from Cerrone called and said, can these things operate at 600 degrees? Kross said, yes, that's what they're designed for. It tied in, matched exactly with the specifications. This was all relied upon and this is pled repeatedly in the second and third amended complaints. You may continue with your argument. Your Honor, with respect to Scandrolli, Scandrolli repeatedly said it's OEM, it's OEM, it was the architect. The second amended complaint citing to the contract itself between Scandrolli and FPM states, paragraph 39, nevertheless, the Scandrolli FPM contract provided that Scandrolli was, quote, solely responsible for all construction means, methods, techniques, sequences, and procedures within the scope of work, article three of the contract. Paragraph 40, the FPM Scandrolli contract further provided that, quote, any advice of OEM or in accordance with the contract documents. Paragraph 41, the FPM, sorry, that was an article 10.1 of the contract. Paragraph 41 of the second amended complaint, the FPM Scandrolli contract also specified that Scandrolli, quote, shall not be relieved of its obligations to perform the work in accordance with the contract documents by the activities or duties of OEM or OEM's administration of the contract or by tests, inspections, or approvals. I'll let you finish your point, and your time is now up, and I want to thank all counsel for your arguments. The court will take this matter under advisement and run their decision in due course.